

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed August 30, 2022**

_____

**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| CARMINE J. BIANCO and | § | Case No. 19-43914-ELM |
| CATHERINE A. BIANCO, | § | |
| | § | Chapter 7 |
| Debtors. | § | |
| | § | |
| WALTER LEON and | § | |
| JAMIE LEON, | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | Adversary No. 20-04003 |
| | § | |
| CARMINE J. BIANCO and | § | |
| CATHERINE A. BIANCO, | § | |
| | § | |
| Defendants. | § | |

## <u>MEMORANDUM OPINION</u>

In this action, Plaintiffs Walter and Jamie Leon have filed suit against Carmine and Catherine Bianco, the chapter 7 debtors in Case No. 19-43914 pending before the Court (the **"Bankruptcy Case"**), to seek a determination that certain debt allegedly owed by the Biancos to the Leons is nondischargeable under section 523 of the Bankruptcy Code. Pursuant to their

Complaint,[1] the Leons allege that the Biancos fraudulently induced them into advancing over $230,000 to the Biancos for the purpose of a restaurant project. While they acknowledge that they were led to believe that a portion of the advances would be used to acquire an equity interest in a to-be-formed corporation that would own the restaurant, because the Biancos never organized (nor allegedly intended to organize) the corporation, the Leons characterize these advances, as well as the remaining advances, as loans owed by the Biancos to the Leons.[2] Alternatively, the Leons claim that the Biancos owe a debt to them for the advances because the Biancos allegedly fraudulently solicited and obtained them from the Leons. Either way, because the advances were allegedly obtained by false representations, they assert that the debt is nondischargeable under section 523(a)(2)(A) of the Bankruptcy Code.[3] Additionally, claiming that the debt is for willful and malicious injury inflicted upon the Leons by the Biancos, the Leons further assert that the debt is nondischargeable under section 523(a)(6) of the Bankruptcy Code.[4]

The Biancos timely filed an Answer in opposition to the Complaint.[5] Following up on the Answer, in their pretrial submissions to the Court the Biancos dispute the existence of any debt, claiming that the entirety of the amount advanced by the Leons constituted an investment in the Biancos' restaurant business and that any loss that the Leons suffered was contributed to by the Leons' alleged failure satisfy their investment obligations.[6]

---

[1] *See* Docket No. 22 (First Amended Complaint, referred to herein as simply the "**Complaint**").

[2] *See generally* Complaint, ¶¶ 3.03 – 3.11.

[3] *See* Complaint, ¶¶ 4.01 – 4.04; *see also* Docket No. 44 (Amended Joint Pretrial Order (the "**PTO**")), ¶¶ I.A.1 – I.A.2.

[4] *See* Complaint, ¶¶ 4.05 – 4.08; *see also* PTO, ¶¶ I.A.1 – I.A.2. Pursuant to the Complaint, the Leons have also asserted a claim for the recovery of attorneys' fees and expenses. At trial, however, the Leons abandoned such claim.

[5] *See* Docket No. 6 (the "**Answer**").

[6] *See* PTO, ¶¶ I.B.3 – I.B.4.

The case came on for trial before the Court on February 2-3, 2021. Having now considered the Complaint, the Answer, the parties' respective contentions and joint statement of stipulated facts in the Amended Joint Pretrial Order,[7] the parties' other pretrial submissions,[8] the evidence introduced at trial, and the representations and arguments of counsel, the Court now issues its findings and conclusions pursuant to Federal Rule of Civil Procedure 52, as made applicable to this proceeding pursuant to Federal Rule of Bankruptcy Procedure 7052.[9]

## *JURISDICTION*

The Court has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157 and *Miscellaneous Order No. 33: Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* (N.D. Tex. Aug. 3, 1984). Venue of the proceeding in the Northern District of Texas is proper under 28 U.S.C. § 1409. The proceeding is core in nature pursuant to 28 U.S.C. § 157(b)(2)(I).

## *FACTUAL BACKGROUND*

The Biancos are an entrepreneurial couple who, over the years, have started or participated in a number of different business ventures. In early 2018, the Biancos seized upon the opportunity to open a restaurant when leasehold space in a shopping strip located at 6501 South Cooper Street in Arlington, Texas opened up (the "**Restaurant Location**"). To secure the space, on January 23, 2018, Carmine Bianco entered into a 66-month commercial lease with the landlord (the "**Restaurant Lease**").[10]

---

[7] *See* PTO, ¶¶ II.1-25 (collectively, the "**Stipulated Facts**").

[8] *See* Docket Nos. 36 and 37.

[9] To the extent any of the following findings of fact are more appropriately categorized as conclusions of law or include any conclusions of law, they should be deemed as such, and to the extent that any of the following conclusions of law are more appropriately categorized as findings of fact or include findings of fact, they should be deemed as such.

[10] *See* Plaintiffs' Exh. 18.

Because the Biancos had not pinned down the details of the restaurant they would open by the time of execution of the Restaurant Lease, the lease identified the Tenant as "Carmine Bianco d/b/a TBD"[11] and required Carmine to provide evidence of "business entity registration" with the Texas Secretary of State by March 1, 2018.[12] Additionally, to provide time for the buildout of the space, the Restaurant Lease waived the obligation to pay Base Rent during the first six months of the lease term, with the first full lease payment to be due in July 2018.[13] In the meantime, the Restaurant Lease required payment of $13,157.35 to the landlord for prepaid rent and other charges by the earlier of 12 weeks after execution of the lease or the date on which the Certificate of Occupancy had been obtained after completion of the buildout.[14] The Biancos would end up needing financial assistance to meet these requirements pending the opening of the restaurant.

*A.*     ***The Biancos Organize Ranch Hand Steakhouse LLC***

Ultimately, the Biancos determined to open a steakhouse restaurant that they would name the "Ranch Hand Steakhouse" (the "**Restaurant**"). As indicated above, the Restaurant Lease contemplated the organization of a business entity through which the Restaurant would be held and operated – but the Biancos had a problem. Due to their poor credit and ongoing litigation involving certain of their other business ventures,[15] they were worried that any business entity that they might organize would have difficulty securing the necessary licenses, permits, and vendor contracts for the Restaurant if the Biancos, themselves, were identified as having a connection to the entity. Therefore, they recruited Henry Carlile ("**Carlile**"), Catherine Bianco's brother-in-law,

---

[11] *See* Restaurant Lease, at p.1.

[12] *See id.*, at p.10 (¶ 7).

[13] *See id.* (¶ 6).

[14] *See id.*, at p.2 (¶ 8.B.).

[15] *See, e.g.*, Plaintiffs' Exh. 24 (Statement of Financial Affairs, response to question 9 – listing numerous lawsuits in which one or both of the Biancos is or was a party during the relevant timeframe).

to serve as the straw owner and manager of the new business. Carlile had no prior restaurant experience. He was employed in the fiber optics field in North Carolina.

With this strategy in place, on March 15, 2018, Catherine organized Ranch Hand Steakhouse LLC (the "**Steakhouse LLC**") – a member-managed Texas limited liability company – and identified Carlile as the sole managing member of the company in the company's Certificate of Formation.[16] The business address of the Steakhouse LLC was identified as the same address as the Restaurant Location.[17] Roughly a week later, on March 21, 2018, Carmine opened a business checking account at Frost Bank (account number ending 3788) in the name of "Carmine Bianco dba Ranch Hand Steakhouse" (the "**Initial Steakhouse DBA Account**").[18]

Thereafter, on March 28, 2018, the Biancos arranged for Carlile to execute an On-Premise Prequalification Packet to pursue the obtaining of a liquor license from the Texas Alcoholic Beverage Commission for the Restaurant (the "**TABC Application**"),[19] and in the application Steakhouse LLC was identified as the Restaurant owner and Carlile was identified as Steakhouse LLC's owner and manager.[20] Shortly thereafter, on April 18, 2018, Carmine and Carlile executed an Electronic Credit Application with U.S. Foods, Inc. to facilitate the Restaurant's ability to place orders with U.S. Foods on credit (the "**US Foods Application**"),[21] and pursuant to the US Foods Application Steakhouse LLC (with an address at the Restaurant Location) was identified as the Applicant and Carlile was identified as Steakhouse LLC's member and manager.[22]

---

[16] *See* Plaintiffs' Exh. 15.

[17] *See id*.

[18] *See* Plaintiffs' Exhs. 20-A and 20-B, at p.1.

[19] *See* Plaintiffs' Exh. 16.

[20] *See id.* (¶¶ 4, 8 and 9, and the signature page).

[21] *See* Plaintiffs' Exh. 31-B, at pp.6-8.

[22] *See id*.

**B.**     ***The Biancos Solicit Purported Investment Capital from the Leons***

The Leons are a married couple.  In early May 2018, the Leons and Biancos were introduced to one another by mutual friends at a restaurant located in the same shopping strip as the Restaurant Location.  Casual conversation between the new acquaintances eventually led to the Biancos revealing to the Leons that they were planning to open the Restaurant and were pursuing investors to join in the business venture.  Intrigued by the concept, the Leons accepted the Biancos' on-the-spot invitation to walk over to the Restaurant Location to look at the partially built out space.

A few days later, Walter Leon and Carmine Bianco continued their conversation about the Restaurant investment opportunity over the phone.  The two agreed to meet in person with their spouses in the next few days.  Walter – a physician of 31 years and manager of a medical practice with approximately 28 employees – had some experience in business investment.  Among other things, he had personally invested in several outside business ventures in the past.  His spouse, Jamie Leon, on the other hand, had never invested in or started a business of his own.  Neither of the Leons had any experience in the restaurant field, nor did they have any familiarity with the work entailed in opening and managing a new restaurant.

As agreed, the Leons and Biancos met in person a few days later.  At the meeting, Carmine represented to the Leons that he had prior experience in the restaurant industry as both a chef and restaurant owner and the Biancos claimed to have already personally invested over $100,000 into the Restaurant project.  Planning to open the Restaurant in roughly six to eight weeks – by no later than July 4th – the Biancos professed the need for an additional $50,000 to complete the build-out. They represented that their other investor had backed out of the project, thereby opening up an opportunity for the Leons to invest.  During the course of the conversation, Jamie inquired into the

possibility of using some of the space within the Restaurant for an event room to cater corporate events. The Biancos indicated that they were open to the concept if the Leons were to invest.

At no time during the meeting did the Biancos disclose the existence of Steakhouse LLC, the Steakhouse LLC's connection to the Restaurant, or Carlile's involvement with Steakhouse LLC or the Restaurant project. Instead, the Biancos represented the investment opportunity as one through which the Biancos and Leons, alone, would jointly own the Restaurant business. At the conclusion of the meeting, the Biancos offered the Leons the opportunity to acquire a 20% interest in a to-be-formed corporation that would own the Restaurant for an investment of $50,000.

**C.      *The Leons Make the Decision to Invest***

While the Leons had no prior experience in the restaurant industry, they agreed to make the investment based upon, among other things, Carmine Bianco's professed expertise in the restaurant industry, the belief that the Biancos were already fully committed to the success of the Restaurant given their own alleged investment in the Restaurant, the opportunity for Jamie Leon to pursue catering jobs using an event room at the Restaurant, and the fact that the four of them would be the only investors in the Restaurant with the opportunity for the Leons to have a voice in the Restaurant business.

To document the purported investment, the Biancos prepared a Purchase Agreement, dated May 16, 2018, between "Ranch Hand Steakhouse," as Seller (the "**Steakhouse Corporation**"), and the Leons, as Buyer (the "**First Investment Agreement**").[23] Pursuant to the First Investment Agreement, the Steakhouse Corporation purported to agree to sell, and the Leons agreed to buy, "Products" – described as a "20-percent Shareholder" interest – in exchange for a Purchase Price of $50,000 due immediately upon execution of the agreement. On May 16, 2018, the Biancos

---

[23] *See* Defendants' Exh. 1.

executed the First Investment Agreement as the purported "Members" of the Steakhouse Corporation and the Leons executed the agreement as the Buyer.[24] On the same date, the Leons provided a cashier's check to the Biancos in the amount of $50,000 made payable to "Ranch Hand Steakhouse" (the "**First Advance**").[25]

When the First Investment Agreement was executed, no such Steakhouse Corporation existed. The Leons were aware of this fact but were assured by the Biancos that the Steakhouse Corporation would be promptly organized, that the Steakhouse Corporation would own the Restaurant, and that the Leons would receive the agreed-upon 20% shareholder interest. The Biancos further assured the Leons that the First Advance would be used exclusively for Restaurant purposes. On May 17, 2018, the First Advance was deposited into the Initial Steakhouse DBA Account.[26]

Four days later, on May 21, 2018, Carmine caused $33,648.43 of the First Advance to be transferred from the Initial Steakhouse DBA Account to one of the Biancos' individual checking accounts at Frost Bank in the name of Carmine Bianco (account number ending 0681) (the "**Bianco Personal Account**").[27] Thereafter, while it appears that some of the transferred funds may have been used to acquire items for the Restaurant,[28] it is equally clear that some of the transferred funds were used by the Biancos to pay for a variety of personal expenses, including their home mortgage,

---

[24] *See id.*; *see also* PTO (Stipulated Facts, ¶ 20).

[25] *See* Plaintiffs' Exh. 1; *see also* PTO (Stipulated Facts, ¶ 9).

[26] *See* Plaintiffs' Exh. 20-B (Bates stamp LEON 0989).

[27] *See* Plaintiffs' Exhs. 20-B (Bates stamp LEON 0990), 21-A (Bates stamp LEON 0093), and 21-B (Bates stamp LEON 0102).

[28] *See, e.g.*, Plaintiffs' Exh. 21-B (Bates stamp LEON 0104-0105) (reflecting transactions with Floor and Décor, Home Depot, and Main Auction Services).

groceries, pharmaceutical products, gas, and the like.[29]  By the end of May 2018, funds in the
Initial Steakhouse DBA Account had dried up and the account was closed.[30]

**D.      The Biancos Solicit Additional Purported Investment Capital from the Leons**

Within a month, the Biancos again approached the Leons for money.  This time, claiming
to be moving forward with the opening of an additional steakhouse restaurant location in Burleson,
Texas, the Biancos explained that they needed help in funding the deposit necessary to hold the
space with the landlord.  Being enthusiastic about the prospect for immediate growth of the
restaurant business, the Leons expressed a willingness to commit additional investment capital,
but only if they would have an equal interest in the business going forward.  The Biancos responded
that they were agreeable to the same under a staggered step-up arrangement.

In particular, the Biancos agreed to increase the Leons' ownership in the restaurant
business over time, up to 50%, in exchange for additional invested capital as needed for the
business.  While a ballpark capital commitment in the range of $200,000 was discussed as roughly
equivalent to a 50% ownership interest in the restaurant business, no definitive agreement was
reached between the Biancos and Leons with respect to the amount of additional capital that would
need to be invested for the Leons to acquire the additional 30% interest in the business.  Not until
late July 2018, after the Leans had advanced an additional $123,920, as discussed below, did the
Biancos agree that the Leons had hit the contribution mark deemed sufficient to earn the full 50%
interest in the business.

Nevertheless, with an agreement in principle in place to become equal co-owners, the
Leons agreed to provide additional investment capital, starting with the capital allegedly needed

[29] *See id.* (reflecting transactions with Apple iTunes, Walgreens, CVS, Tom Thumb, Kroger, Quicktrip, Amerihome Mortgage, USAA.com, and TWC/Time Warner Cable).

[30] *See* Plaintiffs' Exh. 20-B (Bates stamp LEON 0990).

by the Biancos to hold the leasehold space for the second steakhouse restaurant. In this regard, the Biancos requested the Leons to fund $23,210, supposedly one-half of the deposit required by the landlord. On June 13, 2018, the Leons made the payment through the issuance of a check in such amount, which Carmine directed the Leons to make payable to Carmine (the "**Second Advance**").[31] Thereafter, the Biancos documented the purported investment in a second Purchase Agreement between the Steakhouse Corporation, as Seller, and the Leons, as Buyer, dated June 12, 2018 (the "**Second Investment Agreement**").[32] The Biancos and Leons executed the Second Investment Agreement on June 25, 2018 – the Biancos again signing on behalf of the Steakhouse Corporation as "Members" and the Leons individually signing as the Buyer.[33] Pursuant to the Second Investment Agreement, in exchange for the Second Advance the Steakhouse Corporation purported to agree to sell the Leons "Products" – described as "Amount paid towards 50-percent Shareholder of Ranch Hand Steakhouse and all enitites [sic] therein."[34]

The Second Advance was deposited into the Bianco Personal Account.[35] Contrary to the representations made to the Leons, none of the Second Advance was used to fund a deposit for a second restaurant location.

The next round of funding came on July 2, 2018, following the Biancos' request for additional capital, with the Leons paying an additional $40,000 through the issuance of a check which Carmine again directed the Leons to make payable to him (the "**Third Advance**").[36] The Biancos documented the purported investment in a third Purchase Agreement between the

---

[31] *See* PTO (Stipulated Facts, ¶ 10).

[32] *See* Defendants' Exh. 2.

[33] *See id*.; *see also* PTO (Stipulated Facts, ¶ 21).

[34] *See* Defendants' Exh. 2.

[35] *See* Plaintiffs' Exh. 21-B (Bates stamp LEON 0104).

[36] *See* PTO (Stipulated Facts, ¶ 11).

Steakhouse Corporation, as Seller, and the Leons, as Buyer, dated July 2, 2018 (the "**Third Investment Agreement**").[37]  The Biancos and Leons executed the Third Investment Agreement on July 2, 2018 – the Biancos again signing on behalf of the Steakhouse Corporation as "Members" and the Leons individually signing as the Buyer.[38]  Pursuant to the Third Investment Agreement, in exchange for the Third Advance the Steakhouse Corporation again purported to agree to sell the Leons "Products" – described as "Amount paid towards 50-percent Shareholder of Ranch Hand Steakhouse and all enitites [sic] therein."[39]

The Third Advance was deposited into the Bianco Personal Account.[40]  While it appears that some of the transferred funds may have been used by the Biancos to acquire items for the Restaurant,[41] it is equally clear that some of the transferred funds were used by the Biancos to pay for a variety of personal expenses, including their home mortgage.[42]

The next request for capital from the Biancos came in mid-July 2018, after the Restaurant's targeted July 4th opening had been missed.  By this point, the Leons were becoming anxious about the status of the project and the Restaurant opening.  Desiring to get the Restaurant opened, in response to the Biancos' request for an additional $7,500, the Leons paid $2,500 on July 15, 2018, through the issuance of a check made payable to the "Ranch Hand Steakhouse;"[43] and an additional $5,000 on July 20, 2018, through the issuance of a second check made payable to the "Ranch Hand

---

[37] *See* Defendants' Exh. 3.

[38] *See id.*; *see also* PTO (Stipulated Facts, ¶ 22).

[39] *See* Defendants' Exh. 3.

[40] *See* Plaintiffs' Exh. 21-B (Bates stamp LEON 0104 and LEON 0108).

[41] *See* Plaintiffs' Exh. 21-B (Bates stamp LEON 0108-0111).

[42] *See id.* (reflecting transactions with Apple iTunes, Kroger, Ulta, Old Navy, Amerihome Mortgage, Home Warranty, USAA.com, and TWC/Time Warner Cable).

[43] *See* PTO (Stipulated Facts, ¶ 12).

Steakhouse."[44]    The Biancos documented the additional purported investment (the "**Fourth Advance**") in a fourth Purchase Agreement between the Steakhouse Corporation, as Seller, and the Leons, as Buyer, dated July 16, 2018 (the "**Fourth Investment Agreement**").[45]    The Biancos and Leons executed the Fourth Investment Agreement on July 16, 2018 – the Biancos again signing on behalf of the Steakhouse Corporation as "Members" and the Leons individually signing as the Buyer.[46]    Pursuant to the Fourth Investment Agreement, in exchange for the Fourth Advance the Steakhouse Corporation purported to agree to sell the Leons "Products" – described as "Amount paid towards 50-percent Shareholder of Ranch Hand Steakhouse and all enitites [sic] therein."[47]

Finally, when the Biancos represented the need for yet another $30,000, the Leons agreed to make the payment but only if the advance was documented as the final payment required to earn the previously agreed upon 50% interest in the business.    The Biancos agreed and the Biancos documented the final $30,000 purported investment (the "**Fifth Advance**," and together with the First Advance, Second Advance, Third Advance, and Fourth Advance, the "**Investment Advances**") in a fifth Purchase Agreement between the Steakhouse Corporation, as Seller, and the Leons, as Buyer, dated July 16, 2018 (the "**Fifth Investment Agreement**," and together with the First Investment Agreement, Second Investment Agreement, Third Investment Agreement, and Fourth Investment Agreement, the "**Investment Agreements**").[48]    The Biancos and Leons executed the Fifth Purchase Agreement on July 23, 2018 – the Biancos again signing on behalf of the Steakhouse Corporation as "Members" and the Leons individually signing as the Buyer.[49]

---

[44] *See* PTO (Stipulated Facts, ¶ 13).

[45] *See* Defendants' Exh. 4.

[46] *See id.*; *see also* PTO (Stipulated Facts, ¶ 23).

[47] *See* Defendants' Exh. 4.

[48] *See* Defendants' Exh. 5.

[49] *See id.*; *see also* PTO (Stipulated Facts, ¶ 24).

Pursuant to the Fifth Investment Agreement, in exchange for the Fifth Advance the Steakhouse Corporation purported to agree to sell the Leons "Products" – this time described as "Amount paid equals 50-percent Shareholder of Ranch Hand Steakhouse and all enitites [sic] therein."[50] The next day, on July 24, 2018, the Leons made the Fifth Advance through the issuance of a check in the amount of $30,000 made payable to the "Ranch Hand Steakhouse."[51]

On July 17, 2018, Carmine Bianco opened a new sole proprietorship/dba business checking account at Frost Bank (account number ending 2766) in the name of "Carmine Bianco dba Ranch Hand Steakhouse" (the "**Second Steakhouse DBA Account**").[52] Each of the Fourth Advance and the Fifth Advance (less $2,000) was deposited into the Second Steakhouse DBA Account.[53]

On the very same day as the opening of the Second Steakhouse DBA Account, the Biancos had Carlile execute a Gordon Food Service Customer Account Application on behalf of the Restaurant to facilitate the Restaurant's ability to place orders with Gordon Food Service on credit (the "**Gordon Food Service Application**").[54] Pursuant to the Gordon Food Service Application, the Restaurant's address was listed at the Restaurant Location and Carlile was identified as the manager and "owner/officer/member" of the Restaurant.[55]

## E. The Leons Never Receive the Promised Equity in the Steakhouse Corporation

Significantly, while the Biancos represented that the Restaurant would be owned by the Steakhouse Corporation, and while each of the Investment Agreements executed by the Biancos on behalf of the Steakhouse Corporation purported to evidence the Steakhouse Corporation's

---

[50] *See* Defendants' Exh. 5.

[51] *See* PTO (Stipulated Facts, ¶ 14).

[52] *See* Plaintiffs' Exh. 22-A.

[53] *See* Plaintiffs' Exh. 22-B (Bates stamp LEON 0897).

[54] *See* Plaintiffs' Exh. 30-B, at pp.7-10.

[55] *See id.*

agreement to issue shares of stock to the Leons, at no point did the Biancos take any steps to organize the Steakhouse Corporation, nor did they ever intend to take any such steps despite their numerous and continuing representations to the Leons to the contrary. Each time the Leons would inquire into the status of the Steakhouse Corporation's formation, the Biancos would simply slow-play them, claiming that it would be handled right after the latest aspect of the Restaurant project was completed. That never happened and no stock was ever issued to the Leons.

Equally significant, at no point did the Biancos ever disclose to the Leons the existence of Steakhouse LLC, its connection to the Restaurant or the Restaurant business (including the TABC Application, the US Foods Application, and the Gordon Food Service Application), or Carlile's connection to the Steakhouse LLC or the Restaurant business. Additionally, at no point did the Biancos ever disclose to the Leons that that they were using Investment Advances to pay for personal expenses.

Ultimately, the Leons neither obtained any of the promised stock in the Steakhouse Corporation nor a refund of any of the Investment Advances (totaling $150,710). The Leons credibly testified that they would have never made the Investment Advances had they known that the Steakhouse Corporation was never going to be organized, that the Restaurant would not be owned by the Steakhouse Corporation, that they were never going to be issued the promised stock in the Steakhouse Corporation, that Steakhouse LLC and Carlile had a purported ownership interest in the Restaurant/Restaurant business, and that the Biancos were going to expend any amount of the Investment Advances on something other than the Restaurant and the Restaurant business.

*F.      The Biancos Successfully Solicit Additional Advances from the Leons*

In August 2018, the Restaurant was finally slated to open.  In advance of the opening, however, the Biancos once again approached the Leons for money.  By this point, the Biancos had used up the investment pretext in soliciting funds.  But knowing that the Leons were fully committed to the Restaurant project based upon the amount of the Investment Advances already made, the Biancos resorted to claims of short-term operational urgency to solicit additional funds.

The Biancos' first approach for an advance came with the representation to the Leons that the Restaurant's air conditioning unit had stopped working, that it would cost $22,000 to repair the unit, and that the landlord was not in a position to fund the repairs in time for the Restaurant's opening, thereby resulting in a crisis.  The Biancos requested the Leons to cover the cost of the A/C unit fix, representing that the landlord would reimburse the cost.  Based upon the Biancos' representations, on August 3, 2018, the Leons advanced the requested $22,000 through the issuance of a check in the same amount made payable to the "Ranch Hand Steakhouse" (the "**Sixth Advance**").[56]  On the same date, the Sixth Advance was deposited into the Second Steakhouse DBA Account.[57]

As the opening of the Restaurant approached, the Biancos approached the Leons for a second operational advance – this time to cover last minute expenses purportedly incurred by the Restaurant in the amount of $30,000.  Desiring to get to an actual opening of the Restaurant, the Leons complied with the request and on August 13, 2018, advanced the $30,000 through the issuance of a check in the same amount made payable to the "Ranch Hand Steakhouse" (the

---

[56] *See* Plaintiffs' Exh. 7; *see also* PTO (Stipulated Facts, ¶ 15).

[57] *See* Plaintiffs' Exh. 22-B (Bates stamp LEON 0900).

"**Seventh Advance**").[58]  On the same date, the Seventh Advance was deposited into the Second Steakhouse DBA Account.[59]

On August 24, 2018, the Restaurant finally opened.[60]  But that did not end the requests for money.  Instead, claiming to need temporary funding to cover portions of the Restaurant's payroll, inventory and rent, the Biancos continued to approach the Leons with additional periodic monetary advance requests.  Being psychologically invested in the Restaurant and believing that they would lose the value of their investment in the Restaurant if the Restaurant closed, the Leons continued to honor the requests by (1) advancing $15,000 on August 27, 2018 through the issuance of a check in the same amount made payable to the "Ranch Hand Steakhouse" (the "**Eighth Advance**"),[61] which was deposited into the Second Steakhouse DBA Account on August 28, 2018,[62] (2) advancing $13,000 on August 29, 2018 through the issuance of a check in the same amount made payable to the "Ranch Hand Steakhouse" (the "**Ninth Advance**");[63] which was deposited into the Second Steakhouse DBA Account on August 30, 2018,[64] and (3) advancing $6,500 on September 19, 2018 through the issuance of a check in the same amount made payable to the "Ranch Hand Steakhouse" (the "**Tenth Advance**," and together with the Sixth Advance, the Seventh Advance, the Eighth Advance, and the Ninth Advance, the "**Operational Advances**"),[65] which was deposited into the Second Steakhouse DBA Account on the same date.[66]

---

[58] *See* Plaintiffs' Exh. 8; *see also* PTO (Stipulated Facts, ¶ 16).

[59] *See* Plaintiffs' Exh. 22-B (Bates stamp LEON 0900).

[60] PTO (Stipulated Facts, ¶ 8).

[61] *See* Plaintiffs' Exh. 9; *see also* PTO (Stipulated Facts, ¶ 17).

[62] *See* Plaintiffs' Exh. 22-B (Bates stamp LEON 0900).

[63] *See* Plaintiffs' Exh. 10; *see also* PTO (Stipulated Facts, ¶ 18).

[64] *See* Plaintiffs' Exh. 22-B (Bates stamp LEON 0900).

[65] *See* Plaintiffs' Exh. 11; *see also* PTO (Stipulated Facts, ¶ 19).

[66] *See* Plaintiffs' Exh. 22-B (Bates stamp LEON 0907).

Following the Restaurant's opening, the Leons dined at the Restaurant once or twice per week to gauge the successfulness of the business. Early on, all indications were that the Restaurant was doing well. As time passed and the Biancos continued to fail to organize the Restaurant Corporation, none of the Operational Advances were reimbursed, and no payments were being made on account of the Investment Advances, however, the Leons became more and more concerned and began to make requests for the Biancos to provide documentation with respect to the Restaurant's financial operations. In particular, the Leons wanted to know where all of the Restaurant's revenue was going. During this time frame, the Biancos were, among other things, using the Second Steakhouse DBA Account to collect Restaurant customer credit card payments.[67]

Similar to the manner in which the Biancos responded to the Leons' continuing inquiries about the status of the Steakhouse Corporation's formation, the Biancos slow-played the Leons and ultimately never provided the requested financial backup. By late November 2018, after the Leons noticed that the Restaurant was also no longer being managed by the hired restaurant manager, the tenor of the communications between the parties began to severely sour. At this point, the Leons began to evaluate their legal options.

In late December 2018, before they were able to map out a legal strategy, the Leons left town for a two-week holiday vacation. When they returned from their trip, they were shocked to find that the Restaurant was closed. Upon further investigation, they learned that the landlord had implemented a lock out of the Restaurant Location for the non-payment of rent. Ultimately, on or about January 7, 2019, the Restaurant closed for good, never re-opening.[68] Significantly, prior to

---

[67] *See, e.g.*, Plaintiffs' Exh. 22-B (Bates stamp LEON 0900, LEON 0907, LEON 0912, LEON 0917, LEON 0921).

[68] *See* PTO (Stipulated Facts, ¶ 8).

the landlord lockout the Biancos never disclosed to the Leons the existence of a default under the Restaurant Lease or of any threatened lockout by the landlord.

Ultimately, none of the Operational Advances (totaling $86,500) was ever repaid to the Leons. In the case of the Sixth Advance, contrary to the representations made by the Biancos, the advance was never used to make a $22,000 payment for repairs to the Restaurant's A/C unit. Only after the Leons persisted in their inquiries about the status of the landlord reimbursement did the Biancos, in October 2018, ultimately attempt to sweep the matter under the rug by delivering two of their own checks to the Leons, each in the amount of $11,000 (with a request for the Leons to hold off on cashing the second check for a week). Upon presentment of the first check for payment, however, the check bounced, and ultimately neither of the checks was successfully cashed. In the case of the remaining Operational Advances, while bank records of the Second Steakhouse DBA Account appear to reflect that some of the advanced funds may have been used for Restaurant purposes, it is equally clear that a portion of the funds was used by the Biancos to pay for a variety of personal expenses.[69] Equally troubling is the number and magnitude of cash withdrawals taken out of the Second Steakhouse DBA Account leading up to the Restaurant's closing, including over $40,000 in October 2018;[70] over $37,000 in November 2018;[71] and over $50,000 in December 2018.[72]

The Leons made the Investment Advances and Operational Advances (collectively, the "**Advances**"), totaling $237,210, based upon the Biancos' representation that the Leons would be co-owners of the Restaurant and Restaurant business through a 50% stockholder interest in the

---

[69] *See generally* Plaintiffs' Exh. 22-B.

[70] *See id*. ("Teller withdrawals" reflected on Bates stamp LEON 0913 – LEON 0915).

[71] *See id*. ("Teller withdrawals" reflected on Bates stamp LEON 0918 – LEON 0919).

[72] *See id*. ("Teller withdrawals" reflected on Bates stamp LEON 0922 – LEON 0924).

Restaurant Corporation, that the only owners of the Restaurant and Restaurant business would be the Biancos and the Leons, and that the Advances would be used solely for Restaurant business purposes and were necessary to open the Restaurant and to manage initial cash flow requirements. The Leons credibly testified that they would have never made the Advances had they known that the Steakhouse Corporation was never going to be organized, that the Restaurant was never going to be owned by the Steakhouse Corporation, that they were never going to be issued the promised stockholder interest in the Steakhouse Corporation, that Steakhouse LLC and Carlile had an interest in and were involved with the Restaurant's business, and that the Biancos were going to expend any amount of the Advances on personal items or for anything other than the Restaurant and the Restaurant business.

## G.      The Biancos File for Bankruptcy Protection

On September 25, 2019, the Biancos initiated the Bankruptcy Case with the filing of their voluntary petition for relief under chapter 7 of the Bankruptcy Code.[73]  On December 23, 2019, the Leons filed a proof of claim in the Bankruptcy Case to assert a claim in the amount of $234,700 based upon the solicited Advances.[74]  In filing for bankruptcy protection, the Biancos hope to discharge any liability that they may have to the Leons on account of the Advances.  The Leons initiated this adversary proceeding with the objective of precluding such discharge.

---

[73] *See* Plaintiffs' Exh. 23 (joint bankruptcy petition filed by the Biancos).

[74] *See* Bankruptcy Case Claims Register, Claim 4-1.

### *DISCUSSION*

**A.      *Determination of Debt Subject to Nondischargeability Claims
          Under Bankruptcy Code Section 523***

Section 523 of the Bankruptcy Code excepts from an individual chapter 7 debtor's bankruptcy discharge certain types of "debts."[75]  The Bankruptcy Code defines "debt" as "liability on a claim"[76] and expansively defines "claim" as meaning a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured" or a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured."[77]  With that framework in mind, because the Biancos have challenged the existence of a debt owed to the Leons, the initial question to address is whether the Biancos have any liability on a claim alleged by the Leons within their Complaint.  The Leons have the burden of proof on such issue.

In relation to same, the Leons have effectively alleged the existence of two different types of claims in their Complaint: (1) a loan-based breach of contract claim; and (2) a fraudulent inducement claim.  In the former case, throughout the Complaint the Leons refer to the Advances as "loans" made to the Biancos.[78]  In the latter case, the Leons allege that they were fraudulently

---

[75] *See* 11 U.S.C. § 523(a) ("A discharge under section 727 … of this title does not discharge an individual debtor from any *debt*" of a kind delineated within the subsections of § 523(a)) (emphasis added).

[76] *Id*. § 101(12).

[77] *Id*. § 101(5).

[78] *See* Complaint, ¶¶ 3.03 – 3.11.

induced by the Biancos into making each of the Advances.[79]  Each of these claims is considered in turn.

### 1.    *Breach of Contract Liability*

Under Texas law,[80] "[t]he essential elements of a breach of contract [claim] are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach."[81]  In relation to the first element, understanding that "[a] loan is a contract wherein one party agrees to let another party have the use of a specific sum of money for a definite period of time in consideration of a promise by the borrower to repay with or without interest,"[82] the Biancos assert that they never entered into an agreement with the Leons for the Advances to be treated as temporary loans to be repaid by the Biancos at a later time.

In this regard, "[u]nder Texas law, '[p]arties form a binding contract when the following elements are present: (1) an offer, (2) an acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding.'"[83]  Thus, relying upon the terms of

---

[79] *See id*., ¶¶ 3.04, 3.05, 3.08, 3.09, 4.03; *see also* PTO, ¶ I.A.1.

[80] Inasmuch as all of the relevant conduct at issue in this case occurred in Texas, the Court finds it appropriate to look to the substantive law of the State of Texas in assessing the Biancos' alleged liability on claims arising under state law.

[81] *Smith Int'l, Inc. v. Egle Group, LLC*, 490 F.3d 380, 387 (5th Cir. 2007) (quoting *Valero Mktg. & Supply Co. v. Kalama Int'l, LLC*, 51 S.W.3d 345, 351 (Tex. App. – Houston [1st Dist.] 2001, no pet.)); *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018) ("A plaintiff asserting a breach-of-contract claim must prove (1) the existence of a valid contract; (2) the plaintiff performed or tendered performance as the contract required; (3) the defendant breached the contract by failing to perform or tender performance as the contract required; and (4) the plaintiff sustained damages as a result of the breach").

[82] *Shaw v. McShane*, 50 S.W.2d 278, 282 (Tex. Comm'n App. 1932); *see also In re NNN 3500 Maple 26, LLC*, No. 13-30402-HDH-11, 2014 WL 1407320, at *5 (Bankr. N.D. Tex. Apr. 10, 2014) ("A loan is a contract.").

[83] *Malone v. Ariba, Inc*., 99 Fed. Appx. 545, 549 (5th Cir. 2004) (quoting *Komet v. Graves*, 40 S.W.3d 596, 600 (Tex. App. – San Antonio 2001, no pet.)); *see also McCoy v. Alden Indus., Inc*., 469 S.W.3d 716, 728 (Tex. App. – Fort Worth 2015, no pet.) (same).

the Investment Agreements, for example, the Biancos assert that the Leons were nothing more than "purchasers of an interest in [the Biancos'] restaurant business as opposed to being lenders."[84] On the flip side, because the Biancos failed to organize the Restaurant Corporation and the Restaurant Corporation failed to issue the promised shares of stock, the Leons argue that their delivery of the Advances to the Biancos should be treated as though they were loans to the Biancos.

The Court disagrees with the Leons. In order for a loan agreement to exist, there must be a meeting of the minds of the parties with respect to the material terms of a lending relationship. "In a contract to loan money, the material terms will generally be: the amount to be loaned, maturity date of the loan, the interest rate, and the repayment terms."[85] Here, among other things, there was never a meeting of the minds with respect to the Biancos' temporary use of the Advances, with respect to a maturity date for repayment, or with respect to the conditions on which the Biancos, themselves, would be obligated to make the repayment. In the case of the Investment Advances, for example, the Leons' execution of the Investment Agreements to purchase stock in the Restaurant Corporation conflicts with any notion of a lending relationship between the Leons and Biancos. And in the case of the Operational Advances, the fact that the Leons made each of the checks payable to the "Ranch Hand Steakhouse" instead of to the Biancos, coupled with the express understanding and intent that each of the Advances would be used solely and exclusively by the Restaurant Corporation for the benefit of what was supposed to be its operating asset, the Restaurant, instead of by the Biancos for their own personal use, similarly conflicts with the notion that a lending relationship existed between the Leons and the Biancos.

---

[84] *See* PTO, ¶ I.B.3.

[85] *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992).

Thus, in short, the Leons have failed to prove by a preponderance of the evidence that a valid loan agreement existed between the Leons and the Biancos.  As such, they have equally failed to establish that the Biancos have any liability on a loan-based claim for breach of contract – *i.e.*, they have failed to establish the existence of a "debt" on such basis.

### 2.    *Fraudulent Inducement Liability*

Under Texas law, "[t]he elements of a claim for fraudulent inducement are '(1) a material misrepresentation, (2) made with knowledge of its falsity or asserted without knowledge of its truth, (3) made with the intention that it should be acted on by the other party, (4) which the other party relied on and (5) which caused injury.'"[86]  In relation to the foregoing elements, the Leons assert that the Biancos made misrepresentations with respect to their promise to organize the Restaurant Corporation, the Restaurant Corporation's ownership of the Restaurant, the Restaurant Corporation's issuance of stock to the Leons, the joint ownership of the Restaurant business by the Leons and Biancos alone, and the exclusive use of the Advances for Restaurant purposes; that each of these misrepresentations was material to the Leons' decision to make the Advances; that the Biancos made the misrepresentations with knowledge of their falsity and with the intent that they would be acted on by the Leons; that the Leons, in fact, relied upon the misrepresentations and would never have made the Advances had they known that the Steakhouse Corporation was never going to be organized, that the Restaurant was never going to be owned by the Steakhouse Corporation, that they were never going to be issued the promised stockholder interest in the Steakhouse Corporation, that Steakhouse LLC and Carlile had an interest in and were involved with the Restaurant's business, and that the Biancos were going to expend any amount of the

---

[86] *Mercedes-Benz USA, LLC v. Carduco, Inc.,* 583 S.W.3d 553, 557 (Tex. 2019) (quoting *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018)).

Advances on personal items or for anything other than the Restaurant and the Restaurant business; and, given that the Leons received nothing in exchange for or on account of the Advances, that such conduct caused injury to the Leons in an amount at least equal to the Advances – *i.e.*, $237,210.[87] The Court agrees.

The Biancos focus their attack on the first and final elements – whether there were any material misrepresentations and whether any injury was caused by any such misrepresentations. In relation to the first element, the Biancos assert that, notwithstanding their failure to organize the Restaurant Corporation, the Leons obtained an ownership interest in the Biancos' sole proprietorship restaurant business; thus, they appear to argue that any representations made with respect to the Restaurant Corporation are non-material because the Leons allegedly obtained the Restaurant ownership interest they sought to acquire. The Leons understandably dispute such contention. First and foremost, the Leons never agreed to jointly own the Restaurant and Restaurant business in the form of a sole proprietorship. Instead, from the very start, the Leons understood and expected their ownership to be held through a separately-organized corporation which would thereby provide a layer of liability protection. Moreover, the Biancos, in reality, never treated the Leons as joint owners of the business in any event. They refused to share operational information with the Leons when requested, they used Restaurant income for personal purposes without any consultation with the Leons, and they did not split any of the Restaurant income withdrawn from the Second Steakhouse DBA Account leading up to the Restaurant's closing with the Leons. Additionally, the Biancos used Steakhouse LLC to acquire the

---

[87] In addition to seeking a determination of the nondischargeability of actual damages, the Leons also request a determination of the nondischargeability of exemplary damages. *See* Complaint, at p.9 (prayer for relief). Because the Leons have not made a claim for exemplary damages as part of their proof of claim filed in the Bankruptcy Case, have not previously been awarded any exemplary damages on account of the conduct alleged, and have not in this case asserted an affirmative cause of action for damages, the Court declines to make any determination with respect to the nondischargeability of exemplary damages.

Restaurant's liquor license and obtain valuable food vendor contractual relationships, identifying Carlile as both an owner of Steakhouse LLC and the Restaurant.

Turning to the final element of fraudulent inducement, the Biancos claim that the Leons contributed to their own injury by failing to fully satisfy their investment obligations. The Leons dispute the existence of any unfulfilled obligations. The Court again agrees with the Leons. The Biancos failed to introduce any credible evidence of any unfulfilled investment obligations on the part of the Leons. In the case of the Investment Advances, the Leons made all of the contractually provided-for payments under the Investment Agreements (albeit the Biancos never applied the payments as promised and represented). In the case of the Operational Advances, the Leons made the advances based upon the Biancos' misrepresentations without having any contractual or legal obligation to do so.

Thus, in short, the Leons have successfully proven the Biancos' liability for the Advances based upon their fraudulent inducement claim. As such, the Leons have established the existence of a "debt" on such basis in the amount of the Advances – *i.e.*, $237,210 – for purposes of section 523 of the Bankruptcy Code (hereafter referred to as the "**Debt for Advances**").

**B.**    *Nondischargeability Under Bankruptcy Code Section 523(a)(2)(A)*

Turning now to the substantive bases for nondischargeability alleged by the Leons, the first provision relied upon by the Leons is section 523(a)(2)(A) of the Bankruptcy Code. Section 523(a)(2)(A) provides that a bankruptcy discharge obtained by an individual debtor does not discharge the debtor from any debt for, among other things, "money … to the extent obtained by … a false representation …, other than a statement respecting the debtor's or an insider's financial

condition."[88]  The Leons have the burden of proving nondischargeability under section 523(a)(2)(A) by a preponderance of the evidence.[89]

The Supreme Court has explained that the operative term "false representation" within section 523(a)(2)(A) is a term of art derived from the common law and thus "impl[ies] elements that the common law has defined [it] to include."[90]  Accordingly, relying upon applicable elements of common law fraud under Texas law, to establish a "false representation" for nondischargeability purposes under section 523(a)(2)(A) courts have required proof of the following: (1) the debtor made a false representation; (2) the debtor knew the representation was false; (3) the debtor made the representation with the intent to deceive the creditor; (4) the creditor actually and justifiably relied on the representation; and (5) the creditor sustained a loss as a proximate result.[91]

Unsurprisingly, the above "false representation" elements mirror the elements of a claim for fraudulent inducement under Texas law.  Thus, inasmuch as none of the misrepresentations at issue in this case was in respect of the financial condition of the Biancos or any insider of the Biancos, for the same reasons that the Leons have successfully proven the Biancos' liability on their claim for fraudulent inducement, the Leons have also successfully proven that the Debt for Advances is nondishargeable under section 523(a)(2)(A) of the Bankruptcy Code.

## C.    *Nondischargeability Under Bankruptcy Code Section 523(a)(6)*

The second substantive basis for nondischargeability alleged by the Leons is section 523(a)(6) of the Bankruptcy Code.  Section 523(a)(6) provides that a bankruptcy discharge obtained by an individual debtor does not discharge the debtor from any debt for "willful and

---

[88] 11 U.S.C. § 523(a)(2)(A).

[89] *Saenz v. Gomez (In re Saenz)*, 899 F.3d 384, 394 (5th Cir. 2018).

[90] *Field v. Mans*, 516 U.S. 59, 69 (1995).

[91] *See Saenz*, 899 F.3d at 394 (citing *AT&T Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 403 (5th Cir. 2001)); *General Elec. Capital Corp. v. Acosta (In re Acosta)*, 406 F.3d 367, 372 (5th Cir. 2005).

malicious injury by the debtor to another entity or to the property of another entity."[92]  The Leons have the burden of proving nondischargeability under section 523(a)(6) by a preponderance of the evidence.

The Supreme Court has explained that, to satisfy the requirements of section 523(a)(6), a creditor must prove that the injury inflicted was a deliberate or intentional injury by the debtor, not simply the byproduct of a deliberate or intentional act by the debtor.[93]  Therefore, to satisfy the "willful and malicious injury" standard of section 523(a)(6), the Fifth Circuit has required proof of either (a) a subjective motive to cause harm on the part of the debtor, or (b) an objective substantial certainty of harm from the debtor's actions.[94]  Here, the Leons have successfully proven the existence of willful and malicious injury from both a subjective and objective standpoint.

First, the Leons have successfully proven that the Biancos intentionally made false representations to them with respect to organization of the Steakhouse Corporation, the Steakhouse Corporation's ownership of the Restaurant and Restaurant business, the Steakhouse Corporation's issuance of stock to the Leons, the exclusive ownership of the Restaurant by the Biancos and Leons, and the use of Advances solely for Restaurant purposes with the subjective, fraudulent intent of causing the Leons to make the Advances which the Biancos then spent however they deemed fit without any corresponding intent to ever form the Steakhouse Corporation or share any part of the ownership of the Restaurant or its revenues with the Leons.  Second, based upon the nature of the Biancos' actions, it is equally clear that it was objectively certain that the Leons would be injured by such actions.  Consequently, the Leons have also successfully proven that the Debt for Advances is nondishargeable under section 523(a)(6) of the Bankruptcy Code.

---

[92] 11 U.S.C. § 523(a)(6).

[93] *See Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998).

[94] *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 606 (5th Cir. 1998), *cert. denied*, 526 U.S. 1016 (1999).

### *CONCLUSION*

Based upon all of the foregoing, the Court finds and concludes that the Biancos owe the Debt for Advances, totaling $237,210, to the Leons on the basis of their liability to the Leons for fraudulent inducement, and that such Debt for Advances is nondischargeable under sections 523(a)(2)(A) and 523(a)(6) of the Bankruptcy Code.  The Court will separately issue a judgment in conformity herewith.

### # # #   END OF MEMORANDUM OPINION   # # #